RECEIVED

AUG – 8 2016

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA, LOUISIANA

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

c

| | |
|---|---|
| RICHARD W. BLACK,<br>Plaintiff | CIVIL ACTION NO. 1:14-CV-00518;<br>SEC. P |
| VERSUS | CHIEF JUDGE DRELL |
| VICTOR JONES, ET AL.,<br>Defendants | MAGISTRATE JUDGE PEREZ-MONTES |

## REPORT AND RECOMMENDATION

On March 10, 2014, *pro se* pretrial detainee Richard W. Black ("Black") filed a complaint against: Victor Jones ("Jones"), Sheriff of Natchitoches Parish; Dean Dove ("Dove"), Warden of the Natchitoches Parish Detention Center; Willie Mae Clark ("Clark"), Registered Nurse and Health Services Coordinator of the Natchitoches Parish Detention Center; and the Natchitoches Parish Detention Center ("NPDC") (collectively, "Defendants"). (Doc. 6). In his Complaint, Black alleged that Defendants denied him the opportunity to see a cardiologist, an ophthalmologist, an orthopedist, a dermatologist, and a gastroenterologist for various ailments that pre-existed his confinement at NPDC. Black sought injunctive relief in the form of an order directing Defendants to provide him the requested care. (Doc. 6; Doc. 92-3). Although not raised in his original claim, Black requests monetary relief in his Response to Defendants' Motion for Summary Judgment (Doc. 100) and in his own Motion for Summary Judgment. (Doc. 123).

In their Motion for Summary Judgment, Defendants submitted affidavits and numerous medical records from before, during, and after the time period Black

1

detailed in his complaint. Defendants argue that Black received ongoing medical treatment during the time he has been detained at NPDC. Black filed a Response to the Motion for Summary Judgment (Doc. 100), reiterating the lack of medical care from outside specialists, and filed  his own Motion for Summary Judgment against Defendants. (Doc. 123).

The motions for summary judgment are now before the Court for disposition.

<u>Background</u>

Black arrived at NPDC on November 26, 2013, after previously being housed at David Wade Correctional Center. (Docs. 6, 92). Black alleges that he submitted requests to the head nurse asking for medical care for glaucoma, his heart and arteries, arthritis and other back problems, skin cancer, and stomach problems. (Doc. 6). Black claims he requested medical care on December 26, 2013, January 17, 2014, and February 10, 2014, but had not received proper medical care as of March 11, 2014. (Doc. 6). Black alleged that prior to his admittance at NPDC, he had been diagnosed and/or treated for his multiple ailments. (Doc. 6).

On January 10, 2014, Black filed a request for an administrative remedy stating that he had been transferred recently from David Wade Correctional Center but that his medical complaints had not been addressed. (Doc. 92-3, p. 11/14). Black also stated that he had been seen by the nurses and the doctor that work for NPDC, but they told him they could do nothing further. (Doc. 92-3, p. 12/14).

<u>Law and Analysis</u>

I.   <u>Summary Judgment</u>

Federal Rule of Civil Procedure 56 mandates that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Furthermore, "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c).

"Summary judgment is appropriate only if 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' when viewed in the light most favorable to the non-movant, 'show that there is no genuine issue as to any material fact.'" <u>TIG Ins. Co. v. Sedgwick James of Washington</u>, 276 F.3d 754, 759 (5th Cir. 2002) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50 (1986)). "A dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." <u>Id.</u> (citation omitted). If the moving party has initially shown "that there is an absence of evidence to support the non-moving party's cause, the non-movant must come forward with

'specific facts' showing a genuine factual issue for trial." Id. (citations omitted). The non-moving party must rely upon more than mere allegations in its pleadings to show a genuine issue for trial. S.E.C. v. Recile, 10 F.3d 1093, 1097 (5th Cir. 1993). "If the record as a whole could not lead a rational trier of fact to find for the nonmovant, then there is no genuine issue for trial." Vera v. Tue, 73 F.3d 604, 607 (5th Cir. 1996).

## II.   Natchitoches Parish Detention Center as Defendant

The claims against NPDC are frivolous and should be dismissed. Federal Rule of Civil Procedure 17(b) provides the capacity to sue or be sued is determined "by the law of the state where the court is located." Accordingly, Louisiana law determines whether the NPDC possesses the capacity to be sued. Under Louisiana law, correctional centers are not legal entities capable of being sued as they are not juridical persons[1]. Fair v. Crochet, No. 09-4196, 2010 WL 430806, *12 (E.D. La. Feb. 4, 2015) (citations omitted). A jail is "not an entity, but a building." Jones v. St. Tammany Parish Jail, 4 F. Supp. 2d 606, 613 (E.D. La. 1998). Therefore, the Court finds that neither NPDC nor its medical center is a juridical person capable of being sued.

## III.   Medical Care

Black is a pretrial detainee at NPDC. (Doc. 92-3, p. 2/14). Pretrial detainees possess a constitutional right to be free from punishment. See Bell v. Wolfish, 441 U.S. 520, 534-37 (1979). In analyzing a denial of medical care claim, courts must

---

[1] Louisiana Civil Code article 24 defines a juridical person as "… an entity to which the law attributes personality, such as a corporation or partnership." The Louisiana Secretary of State's corporation database does not list NPDC or its medical department as a corporation.

determine whether the claim is directed to a "condition of confinement" or an "episodic act or omission." Scott v. Moore, 114 F.3d 51, 53 (5th Cir. 1997) (citing Hare v. City of Corinth, Miss., 74 F.3d 633, 644 (5th Cir. 1996).

"A 'condition of confinement' case is a 'constitutional attack on general conditions, practices, rules, or restrictions of pretrial confinement.'" Scott, 114 F.3d at 53 (quoting Hare, 74 F.3d at 644). In such a case, if the condition of confinement is not reasonably related to a legitimate, non-punitive governmental objective, the condition is unconstitutional. See Scott, 114 F.3d at 53. Under the episodic act standard, an "episodic act or omission of a state jail official does not violate a pretrial detainee's due process right to medical care [. . .] unless the official acted or failed to act with subjective deliberate indifference to the detainee's rights." Hare, 74 F.3d at 636. Thus, the plaintiff must show that he suffered serious deprivation and deliberate indifference by prison officials. See id. at 643, 650.

The standard applicable to pretrial detainees is the same as that applied to convicted prisoners whose claims are analyzed under the Eighth Amendment. To prevail, a plaintiff must establish that the delay in providing medical care was sufficiently harmful to evidence deliberate indifference to medical needs. See Estelle v. Gamble, 429 U.S. 97 (1976). Deliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of mankind. See Norton v. Dimazana, 122 F.3d 286, 291 (5th Cir. 1997). It occurs when a prison official subjectively knows of and disregards a substantial risk to the inmate's health or safety. Farmer v. Brennan, 511 U.S. 825, 837-40 (1994).

The Court must balance the needs of prisoners against the needs of the penal institution in light of medical necessity, not desirability. Woodall v. Foti, 648 F.2d 268, 272 (5th Cir. 1981). The fact a plaintiff does not believe his medical treatment is as good as it should be is not a cognizable complaint. Prisoners are not constitutionally entitled to the best medical care that money can buy. See Mayweather v. Foti, 958 F.2d 91 (5th Cir. 1992). Furthermore, "to maintain a viable claim for delayed medical treatment there must have been deliberate indifference, which results in a harm." Mendoza v. Lynaugh, 989 F.2d 191, 193 (5th Cir. 1993) (citations omitted).

Here, although Black alleges Defendants refused to provide medical care (See Docs. 6, 100), Black was repeatedly seen and treated at NPDC by its physician and medical staff and by various University Health physicians in both Shreveport and New Orleans. (See generally Docs. 92-5, 92-6). Black's medical treatment is discussed more fully below. Additionally, in the January 10, 2014 request for an administrative remedy, Black stated that he had been seen by the nurses and the doctor that work for NPDC, but that they told him that they could do nothing further for him. (Doc. 92-3, p. 12/14). The crux of Black's complaint is that he has not seen the "proper doctors" for his illnesses, meaning specialists who treat the particular medical conditions. (Doc. 92-3, p. 12/14; Doc. 100).

Additionally, Defendants submitted a report from a medical examination of Black performed by Doctor Otis Barnum ("Dr. Barnum"), the staff physician, on February 24, 2015. (Doc. 92-6, p. 98-101/212). The report provides an overview and

assessment of Black's current health and medical history. Due to Black's lengthy medical history and numerous medical ailments, a summary of Black's medical care is necessary and is more fully addressed below.

Medical History from Arrival at NPDC to Lawsuit

On November 26, 2013, Black arrived at NPDC. (Docs. 6, 92). On November 27, 2013, Black received a physical. (Doc. 92-5, 184-185/200). Black gave a history of glaucoma, cataracts, bypass surgery, hypertension, acid reflux, herpes, chronic diarrhea, and skin cancer. (Id.). Records also list medications brought by Black from David Wade Correctional Center. (Id.). Although Black alleges in his Complaint that Defendants took away his eye drops when he was transferred to NPDC and refused to give them back (Doc. 6), the records list no eye drops with his medication sent from David Wade Correctional Center. (Doc. 92-5, p. 41/200). Additionally, nurses notes indicate that Black had multiple medical conditions but that zero records were sent. (Doc. 92-5, 166/200). The notes also indicate that only some medications were sent with Black, and NPDC would use Black's current medications until Black was seen by the doctor. (Id.).

On December 9, 2013, Black submitted a health care request stating that he had been at NPDC for over a week and was told that a doctor would see him, but that had not happened yet. He specifically stated "I have several illnesses that needs [sic] to be attened [sic] too [sic] soon." Black is not more specific regarding his complaint in the health care request form. (Doc. 92-5, p. 37/200).

7

On December 12, 2013, health care progress notes show that Black was assessed. (Doc. 92-5, 44/200). The progress notes indicated Plaintiff had comorbidities and that the visit was for glaucoma, stomach problems, loose stools, and back pain. (Id.). The assessment and plan stated that Black would be prescribed Zantac for GERD and recommended fiber. (Id.). Basic labs were also ordered and the lab work was performed on December 19, 2013. (Doc. 92-5, 39/200).

On January 10, 2014, forty-five days after arrival at NPDC, Black filed an Administrative Remedy Procedure ("ARP"). (Doc. 92-3, 11-12/14). In the ARP, Black complained of his lack of eye drops. (Id.). Black noted that he had a double bypass surgery performed on his heart and that he still had arteries with blockages and that he had not been checked for over two years. (Id.). Additionally, Black noted that he has arthritis in his back as well as protruding discs and that he was not receiving anything for the pain. (Id.). Black also stated that he has skin cancer and has not received treatment for at least six months. (Id.). Furthermore, Black states that he has stomach problems and diarrhea and other medical problems that have not been treated for over two years. (Id.). Of particular note in the ARP, Black states: "As I have stated above, I have not been seen by the proper doctors for these illnesses in over two years or so. And yes, I have been seen by the nurses and the doctor that comes here, but they tell me that they cannot do nothing further for me on these or any other medical illnesses I have." (Doc. 92-3, 12/14).

On January 17, 2014, Black submitted a health care request form stating: "I need to be seen by a [sic] orthopedics doctor for my back. I am in constantly [sic] pain

because of my back problems. I also need to see a cardiologist, ophthalmogist [sic] and a dermatologist, for my other illnesses." (Doc. 92-5, 192/200).

On January 21, 2014, health care progress notes indicate that Black had comorbidities and complained of back pain. (Doc. 92-5, 44/200). Additionally, the notes indicate that Black stated that he has glaucoma and that they need to get a history. (Id.).

On February 10, 2014, Black submitted a health care request form which stated: "I am having severe stomach problems and need to be seen by a stomach doctor as soon as possible." (Doc. 92-5, 190/200).

On February 13, 2014, health care progress notes indicate that Black complained of abdominal pain and that Black was on omeprazole. (Doc. 92-5, 44/200). The notes indicate that Black had received labs and the results were all okay but that they would continue to watch. (Id.). Additionally, the dosage of omeprazole was increased and fiber was recommended. (Id.). A fecal occult blood test was given soon after. (Doc. 92-5, 188/200).

Also on February 13, 2014, Black was seen for a vision analysis. (Doc. 92-5, 177/200). In a letter dated February 28, 2014, Randall D. Keator, O.D. ("Dr. Keator") recommended that Black be scheduled for cataract evaluation and surgery. (Doc. 92-5, p. 177/200). Black's eye conditions are addressed more fully below.

On February 27, 2014, additional physician orders were given to address Black's bowel movements and to prevent constipation. (Doc. 92-5, 30/200). In addition to the medication Black brought with him from David Wade Correctional Center,

starting from November 27, 2013, medications were ordered and given to Black to treat his medical conditions. (See generally (See generally Doc. 92-5, p. 26, 42, 45, 123, 156/200; Doc. 92-8, p. 9-16/16).

Black had been detained at NPDC for only three months and 12 days before filing his lawsuit. Black filed the Administrative Remedy Procedure 45 days after he had arrived at NPDC. The Court struggles to understand how Defendants could have exhibited subjective deliberate indifference to chronic rather than acute medical complaints in that short period of time. Even so, the records before the Court — which are likely not exhaustive — indicate Black was evaluated and treated for every medical complaint mentioned in this lawsuit well before he filed suit. Providers gave Black a physical, prescribed various medications, ordered blood tests, reviewed records, and examined or took action for Black at least eight times before he filed suit.

Equally important, Black's medical records are riddled with requests and complaints regarding his desire to see different providers (including specialists), receive different medications, and overall, to receive treatment that satisfied his preference. This evidence illuminates the real origin of this lawsuit: Black is chronically disgruntled with the care he receives as an inmate. That disgruntlement alone cannot support his claims. And the evidence does not indicate that his disgruntlement was well founded. Rather, the evidence shows no negligence — much less deliberate indifference — on the part of Defendants.

Black's claims are without merit.

10

<u>Cardiac Care</u>

In his Complaint, Black alleged that he previously had a double bypass surgery on his heart and that several arteries are around 65% to 70% blocked. Black states that he has not been seen by any doctor in over two years to check his condition. (Doc. 6). Black asserts that he should be sent to a cardiologist for follow up. (Doc. 6).

During his time at NPDC, Black was routinely on medication, including a beta blocker and other medication to treat high cholesterol and high blood pressure, such as pravastatin, atenolol, and hydrochlorothiazide. (Doc. 92-5, p. 26, 42, 45, 123, 156/200; Doc. 92-8, p. 11-12/16.) Following a medical examination completed on February 24, 2015, Dr. Barnum noted that Black presented with "no new symptoms nor exam findings to support new coronary artery ischemia nor unstable cardiac condition." (Doc. 92-6, p. 98-101/212). Dr. Barnum stated that "[i]deally many patients undergo stress testing every year or two after bypass surgeries but [ . . . ] this pattern of 'screening' for recurrence of ischemic heart disease is expensive and this routine is usually not followed by patients without insurance assistance." (Doc. 92-6, p. 101/212). Dr. Barnum additionally noted that Black described shortness of breath with activity, but that such instances were mentioned as occurring in 2010 or 2011 while Black was out on parole, and that Black had no exercise routine while incarcerated or after the bypass surgery and out of prison. (Doc. 92-6, p. 101/212). Black had no regular follow-up when out of prison. (Doc. 92-8, p. 2/16).

On August 24, 2015, Black wrote a letter addressed to Fitzhugh (most likely Margaret Fitzhugh, DNP, APRN, FNP-C ("Fitzhugh")), detailing a list of symptoms

and indicating that they were the same symptoms he had when he initially had a "serious medical problem" back in 1998, meaning his cardiac problems. (Doc. 92-6, 158/212). Fitzhugh assessed Black on August 25, 2015. (Doc. 92-8, p. 2/16). Fitzhugh noted that Black was alert and oriented, had a regular heart rate and rhythm, no murmurs, and no other symptoms of a worsening cardiac condition. (Doc. 92-8, p. 2/16). Additionally, Black had a blood test performed on August 26, 2015. (Doc. 92-6, p. 159-162/212).

Black was routinely on medication to treat his cardiac condition. When Black complained of symptoms that he associated with his previous cardiac problems, Black was assessed by medical staff. As Black was asymptomatic and showed no signs of a worsening cardiac condition, there is no sign of a serious medical condition that warranted immediate medical intervention to prevent serious bodily harm and "the decision whether to provide additional treatment is a classic example of a matter for medical judgment." Gobert v. Caldwell, 463 F.3d 339, 346 (5th Cir. 2006).

Cataracts and Glaucoma

On February 13, 2014, Black was seen for a vision analysis. (Doc. 92-5, 177/200). In a letter dated February 28, 2014, Randall D. Keator, O.D. ("Dr. Keator") recommended that Black be scheduled for cataract evaluation and surgery. (Doc. 92-5, p. 177/200). Black was seen at the University Health-Shreveport Eye Clinic regarding glaucoma and cataracts on May 19, 2014. (Doc. 92-6, p. 8-12/212). The physician ordered a refill of eye drops and a prescription for reading glasses for his cataracts. (Doc. 92-5, p. 7/200). Black was given the glasses on June 23, 2014. (Doc.

92-7, p. 1/2). Black was scheduled for a follow-up appointment six months later. (Doc. 92-6, p. 14/212). Also on May 19, 2014, Black submitted a health care request form stating that he needed his eye drops for his glaucoma refilled and that he had been out since May 9, 2014. (Doc. 92-5, p. 21/200). A prior request for a refill of the eye drops was made on May 12, 2014. (Doc. 92-5, p. 22/200). The drops were refilled on May 13, 2014. (Doc. 92-5, p. 22/200). Similarly, after a request to have his eye drops refilled on July 28, 2014, they were refilled. (Doc. 92-6, p. 33/212).

At the follow-up appointment on November 24, 2014 (Doc. 92-6, p. 90/212), Black was examined and again scheduled for a follow-up appointment five months later. (Doc. 92-6, p. 89/212). That appointment occurred on April 13, 2015. (Doc. 92-6, p. 119/212). Black had another follow-up appointment on September 2, 2015 and again was scheduled for another follow-up appointment. (Doc. 92-6, p.167/212).

Black was scheduled for cataract surgery on his left eye on September 24, 2015. (Doc. 92-6, p. 170/212). The Nursing Department obtained a form with a physician's assessment and the date of the scheduled eye surgery, and ordered that Black go to a medical clearance appointment. (Doc. 92-6, p. 172/212). However, on September 23, 2015, Black was advised that his surgery had been cancelled, and that they were rescheduling due to the lack of cardiac clearance. (Doc. 92-8, p. 8/16). On October 14, 2015, Black again had an appointment at University Health-Shreveport eye clinic, but Black still had not received cardiac clearance, so they were unable to proceed with surgery. (Doc. 92-9, p. 68-77/77). The certified medical records from University Health end on October 14, 2015. (Doc. 92-9, p. 1/77).

Black was routinely given eye drops to treat his eye conditions. Although Black complained that NPDC took away his eye drops upon arrival, there was no indication from the list of medications Black had on his transfer to NPDC that Black was prescribed eye drops. Furthermore, medical records indicate that Black was prescribed eye drops by the time he was seen for a vision analysis by Dr. Keator in February 2014. Black was routinely seen for follow-up care at the University Health-Shreveport Eye Clinic, and Black suffered no substantial harm due to a lack of eye medication in those months. Therefore, Black is not able to establish that Defendants acted with deliberate indifference to his medical needs as to his eye conditions.

Back Pain

In his Complaint, Black alleged that he is in pain, has arthritis in his back and hips, and that most discs in his back are severely protruding and have been since 2006. (Doc. 6). On January 17, 2014, Black submitted a Health Care Request Form stating that he "need[s] to be seen by a [sic] orthopedics doctor for my back. I am in constantly [sic] pain because of my back problems. I also need to see a cardiologist, ophthalmologist and a dermatologist, for my other illnesses!" (Doc. 92-5, p. 35/200). Black was referred to the medical doctor for further assessment. (Doc. 92-5, p. 35/200).

On November 9, 2014, Black made a request to see an orthopedist for inflammation in his left hip and pain in his lower back. The complaint was discussed with the offender and Black was instructed that they were waiting on the DOC to schedule an appointment. (Doc. 92-6, p. 88/212). Black submitted a letter to

Defendant Clark on November 19, 2014, inquiring why he had not been seen by the doctor on November 18, 2014. (Doc. 92-6, p. 92/212). The official replied that Black would be seen Tuesday. (Doc. 92-6, p. 92/212). On November 25, 2014, the physician ordered prednisone for Black. (Doc. 92-6, 93/212).

Dr. Barnum addressed Black's lower back pain in his report from Black's February 24, 2015 examination. (Doc. 92-6, p. 98-101/212). Dr. Barnum stated that Black displayed no findings to support a need for repeat scans or neurological consultation, and noted that the prior neurosurgeon did not recommend surgery and that Black presently displayed no findings to suspect significant nerve root irritation. (Doc. 92-6, p. 98, 101/212).

Following the assessment by Dr. Barnum, Black submitted an inmate request form on June 15, 2015 to be seen by an orthopedic doctor for lower back pain. (Doc. 92-6, p. 126/212). The form indicated that the LPN referred him for assessment on June 16, 2015. (Doc. 92-6, p. 126/212; Doc. 92-8, p. 1/16) and medications were ordered by the physician. (Doc. 92-6, p. 127/212). An x-ray on Black's lower back was ordered and a radiology report on Black's lumbar spine was filed on August 20, 2015. (Doc. 92-6, p. 154-56; Doc. 92-8, p. 1).

Contrary to Black's complaint, the record shows that Black received medical care when he complained of back pain. Even though it was not an assessment by a medical specialist as Black wished, this does not show an unreasonable standard of care and falls short of establishing deliberate indifference to his medical needs. Although "continuing back pain is unpleasant[, i]t's existence does not, however, in

15

and of itself demonstrate that a constitutional violation occurred." <u>Mayweather</u>, 958 F.2d at 91.

<u>Stomach and Diet Complaints</u>

In his Complaint, Black alleged an unspecified "bad stomach problem" that causes him diarrhea and other discomforts and stated that he is not being treated for it. (Doc. 6).

According to Black's Health Care Progress Notes, Black was seen on December 12, 2013. (Doc. 92-5, p. 44/200). Black was given fiber and Zantac for GERD, and basic labs were ordered. (Doc. 92-5, p. 44, 180/200). On February 10, 2014, Black submitted a Health Care Request Form complaining of severe stomach pains and requested to be seen by a "stomach doctor" as soon as possible. (Doc. 92-5, p. 32, 190/200). Black was seen on February 13, 2014 when he complained of abdominal pain. His labs were "all ok" and progress notes indicated they will continue to watch and increase his dosage of omeprazole. (Doc. 92-5, p. 44/200). Medical records indicate that a diagnostic test for fecal occult blood was ordered soon after. (Doc. 92-5, p. 31/200). Additional physician orders were submitted on February 27, 2014. (Doc. 92-5, 30/200). Black was also given Metamucil daily. (Doc. 92-5, p. 26, 44/200). Doctor Barnum additionally addressed Black's esophageal reflux in his report and noted that it appeared to be adequately controlled by routine medications. (Doc. 92-6, p. 98-101/212).

The record indicates that medical staff at NPDC were receptive to Black's complaints and treated him when requested. Deliberate indifference requires a

showing that prison officials refused to treat Black, ignored his complaints, intentionally treated him incorrectly, or other similar conduct. The decision whether to provide additional medical treatment is a matter of medical judgment. Although Black wishes to be sent to a medical specialist, the fact that he disagrees with the treatment provided does not meet the deliberate indifference standard.

<u>Skin Complaints</u>

In his Complaint, Black alleged that he has skin cancer and had not been treated for it in over nine months. On May 5, 2014, Black submitted a health care request form stating: "I need to see the doctor to ask her a question about my skin-cancers." (Doc. 92-5, p. 23/200). Black was seen by a health care provider on May 6, 2014, and provided with sunscreen. (Doc. 92-5, p. 23/200).

On February 24, 2015, Dr. Barnum addressed Black's skin condition, namely actinic keratosis, and recommended periodic dermatology evaluation. (Doc. 92-6, p. 101/212). Black was seen at a dermatology clinic on June 24, 2015. The physician indicated that he presented with skin lesions that were concerning to Black, but that "all are asymptomatic, seem to be enlarging." (Doc. 92-6, p. 133/212). The physician took biopsies from the left upper arm, the right helix, and right posterior ear, and additionally noted the presence of actinic keratosis. (Doc. 92-6, p. 141/212).

In an inmate request form filed on June 26, 2015, Black indicated that the nurse directed him to fill out a request so she could change "the dressing on my skin-cancer removals." (Doc. 92-6, p. 138/212). It should be noted that the dermatology

clinic had only conducted biopsies at that time, and no results were available yet as they would take three weeks. (Doc. 92-6, p. 133/212).

The results from the three biopsies were returned on July 15, 2015, and resulted in a diagnosis of basal cell carcinoma and an ED&C (electrodesiccation and curettage) was performed. (Doc. 92-6, p. 141-142/212). Black was referred to an ENT for treatment on the basal cell carcinoma found on the right ear. (Doc. 92-6, p. 142/212). Black received follow-up care on September 9, 2015 (Doc. 92-10, p. 112/126), received a second biopsy behind the previous biopsy site (Doc. 92-10, 124/126), and was scheduled for the procedure on September 24, 2015 (Doc. 92-10, p. 118/126).

Although Black complains of the lack of treatment for skin cancer in his Complaint, the record indicates that when Black submitted a health care request form requesting medical staff examine his skin on May 5, 2014, Black was seen by medical staff the following day. Following Dr. Barnum's examination, Black was sent to the dermatology clinic where the physician indicated that he presented with skin lesions that were concerning to Black, but that all were asymptomatic. As such, the record does not show that Defendants refused to treat Black for his complaint nor was there was indication to Defendants that Black faced a substantial risk of serious bodily harm. Following a recommendation by the staff physician, Black received follow-up care from a dermatologist.

## IV.   State Law Claims

Black seems to assert Louisiana state negligence or medical malpractice claims. However, the general rule is to dismiss supplemental claims when the federal

claims are dismissed. <u>See</u> 28 U.S.C. § 1367(c)(3); <u>Bass v. Parkwood Hosp.</u>, 180 F.3d 234, 246 (5th Cir. 1999). Black's supplemental state law claims therefore fail with his federal law claims.

### V.   Black's Motion for Summary Judgment

Black filed a Motion for Summary Judgment on February 25, 2016. (Doc. 123). Black reiterates his complaint that he has not been seen by outside specialists, specifically a cardiologist, orthopedist, gastroenterologist, and a dietician, and alleges that Defendants failed to act until the lawsuit was filed. Black references his medical records attached to Defendants' Motion for Summary Judgment in alleging Defendants have been deliberately indifferent to Black's serious medical needs.[2] Black's motion raises no new issues, facts, or evidence not addressed by Defendants' Motion for Summary Judgment.

### VI.   Warden Dean Dove and Sheriff Victor Jones

In his Complaint, Black alleged that Warden Dean Dove refused to have Black sent to the medical specialists he had requested and would not answer requests or letters sent to him. (Doc. 6). Additionally, Black alleged that Willie Mae Clark told him that Sheriff Victor Jones would not allow the medical department or Warden Dove to send Black to the medical specialists he had requested and refused to pay for the medical care Black needed. (Doc. 6).

---

[2] In his motion, Black addresses issues with access to the law library and a motion to compel evidence regarding the video surveillance system in the NPDC law library. The Court has addressed those issues following motions filed by Black, and Black has not put forth further evidence in support of those claims.

Warden Dove and Sheriff Jones are not medical professionals. (Docs. 92-11, 12). Black has not offered any evidence that Defendants Dove and/or Jones played any role in Black's treatment, or were otherwise involved in the circumstances leading to Black's lawsuit. Additionally, although Black's allegations are specific to Defendants treatment of Black, Black has not alleged nor proven there was a policy at the prison that caused Black to suffer a violation of his constitutional rights. Medical records indicate that Black received medical care when requested and received follow-up as needed. Therefore, Black has failed to put forth competent evidence raising a genuine dispute as to any material fact regarding whether Sheriff Jones or Warden Dove denied him treatment or otherwise intentionally ignored his medical complaints. See Lee v. Rushing, 530 Fed.Appx. 315, 317-18 (5th Cir. 2013).

The fact that the medical care received by Black was not the best that money can buy, or that Black disagreed with the treatment given, does not prove deliberate indifference to serious medical needs on the part of Warden Dove or Sheriff Jones. There is no evidence that Defendants Dove or Jones interfered with Black's medical treatment. Rather, medical personnel assessed Black's needs and determined whether or not Black needed care from specialists after, depending on Black's symptoms or lack thereof. Furthermore, Black has not alleged any injury, other than potential theoretical future injuries and continuing pain and discomfort related to his back, which was addressed above, and Black has received follow-up care from medical specialists as warranted by Black's conditions and medical assessment by staff at NPDC.

20

VII.   <u>Summary</u>

Since there are no genuine issues of material fact which would preclude a summary judgment, Defendants' Motion for Summary Judgment (Doc. 92) should be granted in favor of Sheriff Victor Jones, Warden Dean Dove, Willie Mae Clark, and the Natchitoches Parish Detention Center. Black's Motion for Summary Judgment (Doc. 123) should be denied, and Black's action against Defendants should be dismissed.

Black has been examined by medical personnel on numerous occasions following Black's sick calls. The medical records reflect that when Black made a request for health care, medical staff was responsive. Although at times an appointment was canceled before being rescheduled, at most the delay between the original appointment and the follow-up appointment constitutes negligence, which is not actionable pursuant to § 1983.

Furthermore, Black was sent from David Wade Correctional Center with a list of medications and has received a continuous supply of medications, including medications to treat his cardiac condition, esophageal reflux, and eye conditions. Although Black seems to have a number of chronic illnesses, Black presents no evidence that Defendants actually knew of and disregarded an excessive risk to Black's health.

Furthermore, even if Black presented sufficient factual allegations regarding deliberate indifference, Black has not alleged that he suffered any physical injury as a result, with the exception of continuing pain and discomfort related to his back.  In

general, Black puts forth theoretical future injuries such as he might "go blind or die" because Defendants refused to send him to medical specialists.

Black wishes to see specialists for each specific ailment he has specified, and to have additional testing, including a stress test, performed. However, the fact that the medical care given is not the best that money can buy, or that the Black disagrees with the treatment given, does not prove deliberate indifference to a serious medical need. Therefore, Defendants are entitled to summary judgement.

<u>Conclusion</u>

Based on the foregoing, IT IS RECOMMENDED that Defendants' Motion for Summary Judgment (Doc. 92) be GRANTED, that Black's Motion for Summary Judgment (Doc. 123) be DENIED, and that Black's action be DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), parties aggrieved by this Report and Recommendation have fourteen (14) calendar days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. No other briefs (such as supplemental objections, reply briefs, etc.) may be filed. Providing a courtesy copy of the objection to the undersigned is neither required nor encouraged. Timely objections will be considered by the District Judge before a final ruling

Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14)

days from the date of its service, or within the time authorized by Fed.R.Civ.P. 6(b),

shall bar an aggrieved party from attacking either the factual findings or the legal

conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in chambers in Alexandria, Louisiana, this _____ day

of August, 2016.

Joseph H.L. Perez-Montes
United States Magistrate Judge